## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Jacksonville Division

CHRISTIAN MONTANEZ,

        Plaintiff,

v.                               Case No.: 25-cv-939

FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the State of Florida,
CENTURION OF FLORIDA, L.L.C.,
a Florida limited liability company,
MARIE-MICHELLE AMEDE,
TRAVIS LAMB, in his official capacity as Warden,
and MARICELIS IRIZARRY-ORTIZ,

        Defendants.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff, Christian Montanez, sues Defendants, the Florida Department of Corrections (FDC), Centurion of Florida, LLC (Centurion), Warden Travis Lamb, Marie-Michelle Amede, and Maricelis Irizarry-Ortiz, and alleges as follows:

### Introduction

1.      Christian Montanez has had type I diabetes since he was seven years old. In 2018, he was sentenced to a ten-year term of incarceration at the Florida Department of Corrections. He was 28 years old and had no major health complications relating to his diabetes.

2.      Ove the past seven years in FDC custody, Christian has developed diabetic retinopathy, renal failure, and diabetic neuropathy. If he survives to his

release date in December 2026, he will leave prison blind, confined to a wheelchair, and requiring dialysis for the rest of his life.

3.    Christian's diabetic complications are the direct result of Defendants' chronic failure to manage and accommodate his diabetes. Absent relief from this Court, Christian is unlikely to survive until his December 2026 release date.

### Jurisdiction and Venue

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States and federal law.

5.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiff by the Constitution and laws of the United States.

6.    Venue lies in the Middle District of Florida pursuant to 28 U.S.C. §1391(b). A substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### Parties

7.    At all material times, Christian Montanez was a prisoner in the custody of Defendant Florida Department of Corrections.

8.    Defendant Florida Department of Corrections (FDC) is an Agency of the State of Florida. It constitutes a public entity within the meaning of Title II of the Americans with Disabilities Act.

9.      Defendant Travis Lamb is the Warden of Reception Medical Center, a prison operated by the FDC. Warden Lamb is sued in his official capacity.

10.      Defendant Centurion of Florida, LLC (Centurion) is an out-of-state corporation, registered and doing business in Florida.  At all times relevant to this case, Centurion contracted with FDC to provide medical and mental health care to people confined at the Reception and Medical Center.

11.      Defendant Maricelis Irizarry-Ortiz is a doctor, who was employed by Centurion and responsible for treating Christian during his incarceration at Reception and Medical Center.

12.      Defendant Marie-Michelle Amede is an Advanced Practice Registered Nurse, who was responsible for treating Christian while he was incarcerated at South Bay Correctional Institution (South Bay CI). Ms. Amede was employed by GEO Secure Services, LLC, a private corporation that operates South Bay CI pursuant to contract with FDC.

## Facts

### Type I Diabetes

13.      Diabetes is a serious health condition that is becoming more prevalent in prisons and across society. With proper medical management and monitoring, people with diabetes can be healthy and avoid severe medical complications.

14.      Diabetes is caused by deficiencies in how the body produces, secretes, or processes insulin. Insulin is a hormone that facilitates the movement of glucose (sugar) from the blood into cells throughout the body.

15.    People with type 1 diabetes have an autoimmune disorder where the body produces little or no insulin. There is no known cure for Type I diabetes.

16.    Prior to the availability of insulin injections, Type I diabetes was fatal. Patients' blood became saturated with glucose due to lack of insulin, causing complications throughout the body. Patients followed a predictable progression of blindness, renal failure, heart failure, and death.

17.    Today, Type I diabetes is managed with a combination of insulin therapy, glucose monitoring, carbohydrate counting, and a healthy lifestyle. With proper management of glucose levels, individuals with Type I diabetes can live long, productive lives, with little complications.

18.    However, inadequate care and management of glucose levels puts people with type 1 diabetes at risk of serious, long-term complications, including blindness, renal failure, nerve damage, pneumonia, seizures, strokes, heart attacks, brain injury, and death. Those complications result from too little or too much insulin in relation to activity and food intake.

19.    Inadequate blood glucose management results in hypoglycemia (low blood glucose) and hyperglycemia (high blood glucose).

20.    Hypoglycemia, if timely identified, can be effectively treated by consuming a ready source of glucose such as fruit juice. If it is not treated promptly, however, hypoglycemia can become severe and life-threatening. Symptoms of hypoglycemia range from lightheadedness, irritability, drowsiness, confusion, convulsions, seizure, loss-of-consciousness, permanent brain damage, and death.

21.    A severe hypoglycemic episode that leads to loss of consciousness harms the brain. When the brain does not receive enough glucose, it shuts down critical brain functions.[1] If left unchecked, hypoglycemia can result in functional brain failure ranging from measurable cognitive impairments to aberrant behaviors, seizure, coma, and death.[2]

22.    Therefore, even after one loss of consciousness from hypoglycemia, it is essential that the affected individual's diabetes management plan is adjusted and that changes are carefully implemented, whether via increased monitoring, changes in medication, or better timing of medication and food intake.

23.    The short-term consequences of hyperglycemia include hunger, thirst, dehydration, headache, nausea, fatigue, blurry vision, frequent urination, itchy skin, and diabetic ketoacidosis, which can be fatal. In addition to these short-term consequences of hyperglycemia, chronic high blood glucose levels cause serious long-term complications including nerve damage, blindness, kidney failure, heart and vascular disease, stroke, and death.

24.    Based on current diabetes management practices, it is well established that treatment interventions and planning modifications are clinically indicated when an individual has even one out of range blood glucose reading that results in unconsciousness.

---

[1] Centers for Disease Control and Prevention, The Effects of Diabetes on the Brain (May 21, 2022), https:ljwww.cdc.gov/ diabetes/library/features/ diabetes-and-yourbrain.html.

[2] Philip Cryer. Hypoglycemia, functional brain failure, and brain death. J Clin Invest. (April 2007) doi: 10.1172/JCI31669; https://pubmed.ncbi.nlm.nih.gov /17 404614/.

Case 3:25-cv-00939-MMH-LLL    Document 34    Filed 10/10/25    Page 6 of 29 PageID 154

25.    As explained further below, Christian has suffered over a dozen episodes of loss of consciousness due to hypoglycemia. Yet Defendants insist that he is being treated appropriately and according to their guidelines; they refuse to have him evaluated by an endocrinologist.

**Diabetic Care in Florida Prisons**

26.    In a correctional setting, management of diabetes requires an organized system of care directed by competent physicians and providers who are well informed regarding the current standards of care for diabetes. Helpful guidelines have been developed and published by the American Diabetes Association and the Federal Bureau of Prisons. *See* Jennifer Sherman et al., *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE 544-555 (2024); Federal Bureau of Prisons, *Management of Diabetes* (2017), https://www.bop.gov/resources/pdfs/diabetes_guidance_march_2017.pdf.

27.    The care provided to people with diabetes in FDC custody is grossly inadequate.[3] Deficiencies include, but are not limited to: failure to adequately monitor and manage blood glucose levels; failure to diagnose and provide adequate, timely care for eye problems; failure to provide appropriate meals; and failure to monitor kidney function.

---

[3] Prisoners at privately-run facilities like South Bay Correctional Facility remain "in the legal custody of the [FDC]." Fla. Stat. § 944.715.

28.    **Developing an appropriate insulin therapy plan**: People with type I diabetes must be provided an individualized plan consisting of specific levels and types of insulin. Such plans must be flexible and adjusted by a qualified provider.

29.    At FDC, insulin therapies are developed by unqualified providers who lack expertise or understanding of type I diabetes.

30.    **Monitoring Blood Glucose**: To determine whether glucose levels are within a an acceptable physiological range in a person with diabetes, glucose levels must be tested frequently throughout the day. "For patients with type 1 diabetes . . . a process must be in place to ensure that patients have access to glucose monitoring on an as-needed basis in order to achieve optimal control and to avoid hypoglycemia." Federal Bureau of Prisons, *Management of Diabetes* (March 2017) at 18.

31.    At FDC, they are normally tested at most twice a day. Patients who are especially prone to glucose changes frequently spend half the day or longer in a persistent hyperglycemic state before testing is performed.

32.    **Evaluation by an Endocrinologist**: Patients with type I diabetes should be seen by an endocrinologist at least once a year. Fort those who have issues maintaining target glucose levels, such evaluations should happen every three months.

33.    At FDC, diabetics are lucky if they see an endocrinologist once every five years. FDC's "chronic care clinic" is generally staffed by nurses who are unable to provide minimally adequate evaluations.

34.    **Diabetic Retinopathy**: People with diabetes must receive an annual eye exam by an appropriately trained eye professional to determine if they are developing diabetic retinopathy, glaucoma, or cataracts. This eye exam is considered preventive care, and should be provided *before* a person with diabetes develops vision impairment.

35.    At FDC, people with diabetes do not see an eye specialist until *after* they develop symptoms of blindness. By this time, they have likely already suffered irreversible damage.

36.    **Diet:** People with diabetes must be provided an individualized meal plan and enables them to control their carbohydrate intake in relation to their activity and insulin dose. Such a meal plan depends on age, weight, weight goals, and activity level. "People with diabetes should also be allowed to replace carbohydrates with a noncarbohydrate option." *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE 544-555 (2024).

37.    People with diabetes in FDC custody are not provided with individualized meal plans, nor are they provided information they need to choose appropriate types and quantities of foods that correspond to their individual needs.

The "diabetic meals" at FDC prisons are almost identical to the regular meals. They are carbohydrate-heavy and wildly inappropriate for a type I diabetic.

38.    **Prevention and Management of Acute Complications**: Prevention and management of severe hypoglycemia and hyperglycemia are necessary components of diabetes care. Moreover, "[a]fter such emergency care, people with diabetes should be referred for appropriate medical care to minimize the risk of future decompensation." *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE 544-555 (2024).

39.    Defendants' prevention, recognition, and management of these acute complications of diabetes are grossly inadequate. Frequently, people with diabetes receive treatment only after they lose consciousness or experience seizures. After such incidents, Defendants fail to refer diabetic prisoners to professionals to minimize the risk of future decompensation. As discussed below, despite Christian's frequent emergencies, Defendants took no action to prevent such emergencies from reoccurring.

40.    **Prevention and Management of Chronic Complications**: Prevention and management of chronic complications of eyes, feet, kidneys, nerves, and blood vessels is a necessary component of diabetes care.

41.    FDC's Care of chronic complications of diabetes is grossly inadequate due to failure to provide timely and effective treatment to prevent disabling damage to eyes, feet, and kidneys.

42.    In short, the care and treatment provided to people with diabetes in FDC custody is grossly inadequate in every conceivable way. Rather than providing meaningful adequate monitoring or preventative care, Defendants merely react—belatedly and inadequately—to complications that develop as a result of long-term deficiencies.

43.    Defendants know, but are deliberately indifferent to, the fact that chronically mismanaged glucose levels pose a serious risk of harm to Type I diabetics.

**Christian Montanez**

44.    Christian Montanez grew up in Osceola County, Florida. When he was 28 years old, he was convicted of a non-violent offense and sentenced to ten years' imprisonment. He entered FDC custody on August 1, 2018.

45.    Prior to his incarceration, Christian had no major health complications related to his diabetes. He had never experienced a diabetic seizure or loss of consciousness from diabetes.

46.    In September 2018, Christian was transferred to South Bay, a facility operated by GEO Secure Services, LLC, pursuant to contract with FDC.

47.    At South Bay, Christian's diet consisted almost entirely of carbohydrates.

48.    Glucose levels are typically measured in mg/dl. The ideal range for a diabetic is between 71 and 140 mg/dl. As glucose levels depart from that range, the

immediate risk rises dramatically. The following chart depicts this relationship between glucose levels and risk of serious harm.[4]

| Glucose level | mg/dl | Risk | Symptoms |
|---|---|---|---|
| Extreme hyperglycemia | Above 600 | Extreme | Organ damage, coma, death |
| Severe hyperglycemia | Above 240 | High | Ketoacidosis, nausea, vomiting, confusion, fatigue |
| Hyperglycemia | 180-250 | Moderate | Thirst, frequent urination, fatigue, blurred vision |
| Borderline hyperglycemia | 120-180 | Low | |
| Normal | 71-120 | None | |
| Hypoglycemia | 55 – 70 | High | Shakiness, sweating, rapid heartbeat, dizziness, irritability |
| Severe hypoglycemia | 54 and below | Extreme | Confusion, loss of consciousness, seizures, coma, brain damage, and death |

49.    At South Bay, Christian frequently experienced severe hypoglycemic incidents, with his glucose levels dropping as low as 24 mg/dl. Such incidents are life threatening and caused Christian to suffer seizures and losses of consciousness.

50.    While hyperglycemia and hypoglycemia are both harmful, hypoglycemia is often more dangerous in the short term because the brain cannot

---

[4] The chart is derived from the following sources: Breakthrough T1D, *Hyperglycemia and hypoglycemia: the highs and lows of T1D*, (July 18, 2023), https://www.breakthrought1d.org /news-and-updates/hyperglycemia-hypoglycemia/; Cleveland Clinic, *Hypoglycemia (Low Blood Sugar)*, (Jan. 31, 2023), https://my.clevelandclinic.org/health/diseases/11647-hypoglycemia-low-blood-sugar; Mayo Clinic, *Hyperglycemia in diabetes*, (Apr. 30, 2025), https:// www.mayoclinic.org/diseases-conditions/hyperglycemia/symptoms-causes/syc-20373631, U.S. Centers for Disease Control and Prevention, *Low Blood Sugar (Hypoglycemia)*, (May 16, 2024), https://www.cdc.gov/diabetes/about/low-blood-sugar-hypoglycemia.html; U.S. Centers for Disease Control and Prevention, *Manage Blood Sugar*, (May 16, 2024), https://www.cdc.gov/diabetes/treatment/.

function without a sufficient supply of glucose. When levels drop below 50, individuals are at a high risk of seizure, loss of consciousness, stroke, permanent brain injury, and death.

51.    Christian's provider for much of his incarceration at South Bay was Defendant Marie-Michelle Amede. She was aware of Christian's erratic glucose levels including his seizures and losses of consciousness due to hypoglycemia.

52.    Christian often expressed concern that his insulin regimen was not appropriate. He told Nurse Amede that the type of insulin she was providing was causing him to "bottom out"—i.e., have dangerous hypoglycemic incidents.

53.    Nurse Amede responded that Christian could either accept her treatment, or be punished with solitary confinement.

54.    Christian often heard Nurse Amede make this threat to other patients. In one instance, after she threatened a man in this way, the man still refused to accept the treatment she recommended. She instructed guards to take him to confinement for disobeying. The man died in confinement hours later.

55.    Medical records reveal that, when Christian was not hypoglycemic, he was often severely hyperglycemic, with his glucose levels regularly exceeding 250 mg/dl. On multiple occasions, his glucose levels exceeded 500 mg/dl—an extremely dangerous level and evidence of completely uncontrolled diabetes.

56.    Christian begged Nurse Amede to allow him to see an endocrinologist to help get his glucose under control. Despite clear evidence of Christian's

uncontrolled diabetes and worsening condition, Nurse Amede rejected Christian's requests.

57.    From 2021 onwards, Christian's eyesight and kidney function progressively declined. That deterioration was directly caused by Nurse Amede's failure to manage his diabetes.

58.    In 2021, a different medical provider at South Bay noticed Chrsitian's deterioration and ordered him an endocrinology consult. This was the first and only time during Christian's seven years of incarceration that FDC or South Bay arranged for him to see an endocrinologist.

59.    The endocrinologist noted that Christian had "poorly controlled diabetes." She recommended changes to Christian's management, including glucose checks three times a day. Nurse Amede failed to comply with the endocrinologist's recommendations.

60.    The endocrinologist further recommended Christian return to clinic in 2-3 weeks, with a log of his glucose levels over that period of time. Nurse Amede did not comply. She never authorized a follow-up visit for Christian.

61.    On April 21, 2022, Christian's glucose reached the remarkable level of 837 ml/dl. At that level, Christian was in imminent danger of kidney failure, stroke, and death.

62.    On that date, Christian was admitted to Lakeside Medical Center. According to the provider's notes on that day, "GEO was called multiple times to

inquire about current insulin regimen and to inform them about the new insulin regimen, however all attempts for contact have failed."

63.     The provider at Lakeside recommended changes to Christian's insulin regimen. Nurse Amede again failed to comply with the provider's recommendations. Christian continued to experience wild fluctuations in his glucose levels.

64.     On May 9, 2022, Christian was transferred to Reception and Medical Center (RMC), a prison operated by the FDC.

65.     FDC contracts with Centurion to provide health care at RMC.

66.     Like South Bay, RMC does not provide Christian with a diet suitable for a diabetic.

67.     RMC does not provide Christian with access to an appropriate source of carbohydrates such as fruit juice or glucose tablets. According to the American Diabetes Association, "For those on insulin or hypoglycemia-inducing oral agents, the availability of snacks, especially those containing fast-acting carbohydrates, is essential to avoid and treat hypoglycemia. These snacks should be prescribed and readily available." *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE 544-555 (2024).

68.     At RMC, there is no air conditioning in Christian's dorm. The heat index in that dorm regularly exceeds 100 degrees Fahrenheit. Such hot conditions are dangerous for anyone, but particularly dangerous to individuals with diabetes, who are especially vulnerable to heat-related illness.

69.    Christian's glucose remained uncontrolled throughout 2022, and his condition continued to worsen. As a result of his uncontrolled diabetes, his diabetic neuropathy worsened, his eyesight declined, and his kidneys failed.

70.    On October 15, 2022, Christian underwent surgery to remove his gallbladder at Jacksonville Memorial Hospital. Following the surgery, the hospital provided him with an endocrinology consult. The endocrinologist recommended Christian receive insulin five times a day—before meals, at bedtime, and at 2:00 a.m. The endocrinologist noted: "Patient requiring high risk insulin therapy due to risk of worsening glucose from physiologic stressors. He will require close glucose monitoring given the accompanying risk of hypoglycemia with insulin therapy."

71.    FDC and Centurion ignored the endocrinologist's recommendations. Pursuant to Centurion's standard procedure, Centurion checked his glucose and gave him insulin at most twice per day.

72.    Predictably, Christian's glucose remained out of control, and his physical condition deteriorated further.

73.    On March 18, 2023, Christian sent a grievance regarding his vision, which at that time had degraded to the point where Christian could only see shadows. FDC responded that Christian was not scheduled to see an ophthalmologist. FDC informed him, "You are being treated in accordance with [FDC] policy and procedure."

74.    On or around December 20, 2023, Christian's counsel wrote to Defendant Lamb, the Warden of RMC. Christian's counsel reported that Christian

15

was repeatedly experiencing diabetic seizures and loss of consciousness, and he "urgently needs to see an endocrinologist to help get his diabetes under control." His request was ignored.

75.    On or around January 23, 2024, Christian suffered another severe hyperglycemic episode. His glucose levels exceeded 500—that is, five times the normal level.

76.    On January 26, 2024, blood test results revealed that Christian had an A1C level of 10.2% The ideal level for a patient with diabetes is below 7%. An A1C of 10.2% demonstrates uncontrolled diabetes.

77.    Throughout 2024 and 2025, Defendant Irizarry-Ortiz was the primary doctor responsible for Christian's care at RMC.

78.    On February 6, 2024, Christian's counsel wrote to Centurion and FDC to express concern regarding Christian's condition and repeat that "he urgently needs to see an endocrinologist to get his diabetes under control."

79.    A Centurion employee responded that Christian's diabetes was under control, and his provider did not think it was necessary for Christian to see an endocrinologist.

80.    On or around March 14, 2024, Christian had another hypoglycemic episode, in which his blood glucose dropped into the low 30s, causing impaired consciousness. Such low levels are life threatening. Christian was brought to an urgent care center for treatment.

81.    On March 21, 2024, Christian's counsel wrote to FDC Tallahassee to alert Secretary Dixon of Christian's dire situation. He explained that Christian's diabetes has never been effectively managed during his incarceration, and as a result he has bounced between life-threatening low and high glucose levels.

82.    On April 25, 2024, a Centurion employee wrote to Christian's counsel to explain that Centurion would adjust his insulin and provide Christian with cataract surgery in July. She did not address Christian's counsel's insistence that Christian needed to see an endocrinologist.

83.    From that point onward, Defendant Irizarry-Ortiz and Centurion inexplicably *reduced* Christian's insulin management, providing him with insulin only once per day.

84.    On May 1, 2024, Christian's counsel wrote to Warden Lamb again. He explained that, as a result of Centurion's once-a-day insulin regimen, Christian experiences even more erratic glucose levels, and he remains hyperglycemic all day until he receives his injection around 3:30 p.m. Centurion's Health Services Administrator at RMC responded that Christian's provider (presumably Defendant Irizarry-Ortiz) determined that one injection of long-term insulin per day was appropriate.

85.    For an individual with type I diabetes like Christian, one shot of long-term insulin per day is grossly inadequate.

86.    Christian suffered diabetic seizures or losses of consciousness in May and August of 2024.

87.    On October 11, 2024, a Centurion employee wrote to Christian's counsel. She stated that Christian "is able to see shadows in his Left eye[.]" She further stated that Christian's "Endocrinology status is stable." Centurion's Health Services Administrator at RMC admitted that Christian had to go to urgent care several times since 2024 due to his extreme glucose levels, but Christian's provider (presumably Defendant Irizarry-Ortiz) had determined that Christian's glucose levels were under control. She further stated that there were no plans for him to see an endocrinologist.

88.    On December 4, 2024, Christian's counsel wrote to Centurion again to ask that Christian at least be provided snacks that he could eat in the event he experiences hypoglycemia. Having such a snack on hand is the simplest, cheapest, and most obvious way to reduce the risk of severe hypoglycemic incidents.

89.    On December 6, 2024, Centurion's health Services Administrator at RMC responded that "the diet he is currently on is clinically appropriate for his medical condition."

90.    Throughout 2025 to the present, Christian's glucose levels have remained erratic, resulting in chronically high glucose levels (above 300 mg/dl), and also hypoglycemic emergencies.

91.    Around April 10, 2025, a Correctional Officer was angry at Christian because his blindness and dialysis resulted in a delay. The officer threatened to withhold dinner from Christian. Christian explained that he was diabetic, and that not eating would likely cause him to suffer a hypoglycemic episode. The guard

nonetheless refused to provide a meal. It was not until Christian's mother frantically called the Warden that the situation was resolved and Christian received an evening meal.

92.    On May 6, 2025, Christian experienced another diabetic seizure.

93.    On June 10, 2025, Christian wrote a formal grievance requesting effective diabetes management. On June 16, 2025, Dr. Irizarry-Ortiz denied his grievance, stating: "You are being treated in accordance with DC policy and procedure."

94.    Christian has exhausted all available administrative remedies.

95.    On August 12, 2025, his glucose level was over 500 mg/dl. On August 13, 2025, it was 409 mg/dl. Upon information and belief, those glucose levels have been common for Christian during June, July, and August 2025. Throughout September 2025, his glucose level was regularly around 400 or 500 mg/dl.

96.    Those glucose levels indicate that Christian is frequently hyperglycemic, his diabetes is grossly mismanaged, and he is in imminent danger.

97.    Given Christian's condition, no endocrinologist would approve Centurion's current protocol of providing him with one shot of insulin per day. That regimen has already been proven ineffective, and it will continue to cause permanent damage to Christian's body and mind.

### COUNT I – AMERICANS WITH DISABILITIES ACT
(against FDC)

98.    Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

99.    This count is brought against Defendant FDC for violations of Title II the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. & 42 U.S.C. § 12131, et seq., and its implementing regulations.

100.    Defendant FDC is a public entity.

101.    Christian was a qualified individual with a disability (type I diabetes).

102.    Christian's diabetes substantially limits or more major life activities, including eating, working, sleeping, working, and caring for himself. It also limits major bodily functions, specifically endocrine function.

103.    Christian had a record of having an impairment that substantially limited one or more major life activity.

104.    Christian met the essential eligibility requirements of the programs, services, and activities operated and provided by Defendant FDC.

105.    Defendant FDC has a nondelegable duty to ensure that prisoners in its custody—including prisoners at privately-run facilities like South Bay—receive accommodations in compliance with the ADA.

106.    Defendant FDC denied and continues to deny Christian the benefits of FDC services, programs, and activities, including but not limited to adequate food and safe housing.

107.    Defendant FDC denied the benefits of its services, programs, and activities by reason of Christian's disability.

108.    Defendant FDC failed to provide Christian with equal access and enjoyment to aids, services, and benefits.

109.    Defendant FDC to make reasonable modifications in policies, practices, and procedures, and failed to provide reasonable accommodations, to avoid discrimination against Christian on the basis of disability.

110.    Defendant failed to properly accommodate Christian's disability by failing to provide him meals that are safe and appropriate for a person with type I diabetes.

111.    Defendant FDC additionally fails to properly accommodate Christian's disability by failing to provide him with snacks to consume in the event of a hypoglycemic emergency.

112.    Defendant FDC additionally fails to accommodate Christian's disability by housing him in a dangerously hot dorm. People with diabetes like Christian are especially vulnerable to heat-related illness. Thus, FDC is subjecting Christian to a substantially increased risk of harm, thereby rendering the benefit of safe housing inaccessible to Christian.

113.    Christian's need for accommodations was and is obvious.

114.    Defendant acted intentionally and/or with deliberate indifference to Christian's need for accommodations and to his ADA rights. Defendant FDC knew that harm to a federally protected right was substantially likely yet failed to act on that likelihood.

115.    As a direct and proximate cause of FDC's acts and omissions complained of herein, Christian has suffered chronically high and dangerously low glucose levels throughout his incarceration. As a result, Christian has suffered

years of severe pain and anguish, and he developed permanent complications including blindness, kidney failure, and neuropathy.

116.    The conduct of FDC also violated the Constitution, including the Eighth and Fourteenth Amendments.

WHEREFORE Plaintiff demands (a) compensatory damages; (b) injunctive relief; and (c) Plaintiff's reasonable attorneys' fees, litigation expenses, and costs.

## COUNT II – REHABILITATION ACT
(against FDC)

117.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

118.    This count is brought against Defendant FDC under Section 504 of the Rehabilitation Act, 29 U.S.C.§ 701, et seq. & 29 U.S.C. § 794, et seq., and their implementing regulations.

119.    Defendant FDC is a program or activity receiving federal financial assistance.

120.    Christian Montanez was and is a qualified individual with a disability (diabetes).

121.    Defendant FDC excluded Christian from participation in, and denied him the benefits of programs or activities, solely by reason of his disability.

122.    Defendant FDC failed to properly accommodate Christian's disability by failing to provide him meals that were safe and appropriate for people with diabetes.

123.   Defendant FDC additionally failed to properly accommodate Christian's disability by failing to provide him with snacks in the event of a hypoglycemic incident, and by housing him in an excessively hot dormitory, which, due to his disability, subjects him to a substantially increased risk of heat-related harm.

124.   As a result, the benefits of food and safe housing have been denied to Christian.

125.   Defendant FDC subjected Christian to discrimination by reason of his disability.

126.   Defendant FDC acted with deliberate indifference to Christian's need for accommodations and to his rights under the Rehabilitation Act.

127.   As a direct and proximate cause of FDC's acts and omissions complained of herein, Christian has suffered chronically high and dangerously low glucose levels throughout his incarceration. As a result, Christian has suffered years of severe pain and anguish, and he developed permanent complications including blindness, kidney failure, and neuropathy.

WHEREFORE Plaintiff demands (a) compensatory damages; (b) injunctive relief; and (c) Plaintiff's reasonable attorneys' fees, litigation expenses, and costs.

## COUNT III – EIGHTH AMENDMENT
(against Centurion and Warden Lamb)

128.   Plaintiff repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

129.    This Count is brought pursuant to 42 U.S.C. § 1983 to redress violations of the Eighth and Fourteenth Amendments of the Constitution of the United States.

130.    This count is brought against Defendant Centurion, who at all material times was acting under color of state law to provide medical care for patients at Reception and Medical Center (RMC), and against Warden Lamb (in his official capacity), who has a nondelegable duty to provide for the medical care of prisoners at RMC.

131.    Centurion and FDC have engaged in a pattern, policy, practice, or custom of failing to provide adequate health care for incarcerated people with diabetes throughout Florida.

132.    Senior officers and employees of Centurion, including policymakers such as Centurion's Health Services Administrator (HSA) at RMC, knew of FDC and Centurion's pattern and practice of failing to provide adequate care to Type I diabetics like Christian Montanez. With deliberate indifference to those people's constitutional rights, Centurion's senior officers and employees failed to remedy the systemic deficiencies relating to diabetics' care.

133.    Senior officers and employees of FDC, including Warden Lamb, knew of Centurion's pattern and practice of failing to provide adequate care to individuals with type 1 diabetes like Christian Montanez. With deliberate indifference to those people's constitutional rights, FDC's senior officers and employees failed to remedy the systemic deficiencies relating to diabetics' care.

24

134.    Centurion's systemic deficiencies for people with type 1 diabetes include:

    a.  Insufficient glucose monitoring (twice per day);

    b.  Inadequate insulin regimen (once per day);

    c.  Failure to refer people with type 1 diabetes for endocrinology consults;

    d.  Failure to follow endocrinologists' recommendations;

    e.  Insufficient screening and treatment for diabetic complications including diabetic retinopathy, renal failure, and neuropathy;

    f.  Failure to take any meaningful action despite chronically abnormal glucose levels.

135.    Centurion and FDC officials were aware that the aforementioned policies are grossly inadequate for people with type 1 diabetes like Christian.

136.    Centurion and FDC officials knew that Christian had an objectively serious medical need.

137.    Centurion and FDC officials were aware that Christian faced a substantial risk of serious harm due to his erratic and extreme glucose levels.

138.    Centurion and FDC officials acted with deliberate indifference to the risk of harm faced by Christian. Defendants have acted with subjective recklessness as used in the criminal law.

139.    Centurion and FDC officials provided care that was medically unacceptable under the circumstances. They have failed to respond reasonably to the risk of harm faced by Christian.

140.    Despite their awareness of Christian's uncontrolled diabetes, Centurion and FDC officials failed to take meaningful action to assist him. They failed to provide him with endocrinology consults, and they continued Christian on a course of treatment that they knew to be ineffective at managing his diabetes.

141.    Centurion and FDC have not responded reasonably to Christian's uncontrolled diabetes and resulting deterioration.

142.    Centurion and FDC's pattern, practice, policy, or custom of inadequate care for people with type 1 diabetes was the moving force behind the violation of Christian's constitutional rights.

143.    Centurion and FDC's pattern, practice, policy, or custom of indifference to diabetic prisoners' health directly and proximately caused Christian years of severe pain and anguish, and caused him to develop permanent complications including blindness, kidney failure, and neuropathy.

WHEREFORE Plaintiff demands (a) compensatory damages from Centurion; (b) injunctive relief from Centurion and FDC; and (c) Plaintiff's reasonable attorneys' fees, litigation expenses, and costs.

## COUNT IV – EIGHTH AMENDMENT
## (against Marie-Michelle Amede and Maricelis Irizarry-Ortiz)

144.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

145.    This count is brought under the Eighth Amendment to the U.S. Constitution via 42 U.S.C. § 1983.

146.    This count is brought against Defendant Marie-Michelle Amede and Defendant Maricelis Irizarry-Ortiz, who at all material times were acting under color of state law.

147.    Defendants Amede and Irizarry-Ortiz were aware that Christian Montanez had objectively serious medical needs.

148.    Defendants Amede and Irizarry-Ortiz were aware that Christian Montanez faced a substantial risk of serious harm due to his uncontrolled diabetes.

149.    Defendants Amede and Irizarry-Ortiz reacted to that risk of harm with deliberate indifference. Their actions rise to the level of subjective recklessness as used in the criminal law.

150.    Defendants Amede and Irizarry-Ortiz disregarded the strong possibility that Christian's uncontrolled glucose levels would cause acute pain and permanent injuries.

151.    Defendants Amede and Irizarry-Ortiz provided care that was medically unacceptable under the circumstances. They have failed to respond reasonably to the risk of harm faced by Christian.

152. Despite their awareness of Christian's uncontrolled diabetes, Defendants Amede and Irizarry-Ortiz failed to take meaningful action to assist him. They failed to provide him with endocrinology consults, and they continued Christian on a course of treatment that they knew to be ineffective.

153. Their deliberate indifference directly and proximately caused Christian Montanez's permanent injuries.

154. As a result of their deliberate indifference, Christian Montanez suffered and continues to suffer severe pain and anguish.

WHEREFORE Plaintiff demands (a) compensatory damages from Defendants Amede and Irizarry-Ortiz, (b) injunctive relief from Defendant Irizarry-Ortiz; and (c) Plaintiff's reasonable attorneys' fees, litigation expenses, and costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands jury trial on all issues.

Dated October 10, 2025.                    Respectfully Submitted,


/s/ Andrew Udelsman

Andrew Udelsman
Florida Bar Number 1051696
**UDELSMAN LAW PLLC**
PO Box 557652
Miami, FL 33255
(786) 390-2698
andy@udelsman.law
**Counsel for Plaintiff**

## **CERTIFICATE OF SERVICE**

I certify that I filed this document and served it on all counsel of record

through the CM/ECF system on October 10, 2025.

*/s/ Andrew Udelsman*
Andrew Udelsman