UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTIAN MONTANEZ,

                Plaintiff,

v.

                                    Case No. 3:25-cv-939-MMH-LLL

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

                Defendants.

_____

## ORDER

### I. Status

Plaintiff Christian Montanez, an inmate of the Florida penal system, initiated this action through counsel by filing a Complaint for Violation of Civil Rights under 42 U.S.C. § 1983 (Complaint; Doc. 1) on August 19, 2025. He is proceeding on an amended complaint (Amended Complaint; Doc. 34). Montanez names five Defendants in the Amended Complaint: (1) the Florida Department of Corrections (FDOC); (2) Centurion of Florida, LLC (Centurion); (3) Marie-Michelle Amede; (4) Warden Travis Lamb; and (5) Maricelis Irizarry-Ortiz. Amended Complaint at 1–3. He asserts Defendants violated his rights under the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and the Eighth Amendment to the United States Constitution. See generally id.

This matter is before the Court on Defendant Amede's Motion to Dismiss (Amede Motion; Doc. 39), Defendants Centurion and Irizarry-Ortiz's Motion to Dismiss (Centurion Motion; Doc. 41), and Defendants FDOC and Lamb's Motion to Dismiss (FDOC Motion; Doc. 74) (collectively Defendants' Motions). Montanez filed a response to each Motion. See Docs. 46, 47, 90 (collectively Montanez's Responses). With authorization from the Court, Defendants Amede, FDOC, and Lamb filed replies to Montanez's Responses. See Docs. 48, 52, 59, 91, 92, 95. Thus, Defendants' Motions are ripe for review.

Also before the Court is Montanez's Motion for Preliminary Injunction (PI Motion; Doc. 62) and supplement (Doc. 63), in which he requests preliminary injunctive relief against all Defendants but Defendant Amede. All relevant Defendants filed a response (Centurion PI Response; Doc. 77; FDOC PI Response; Doc. 78) (collectively PI Responses). With authorization, Montanez filed a reply, and Defendants FDOC and Lamb filed a surreply. See Docs. 79, 80, 81, 82, 84, 89.

### II. Montanez's Allegations[1]

In his Amended Complaint, Montanez alleges that "Defendants' chronic failure to manage and accommodate [Montanez's] diabetes" has resulted in serious complications including diabetic retinopathy, renal failure, and diabetic neuropathy. Amended Complaint at 1–2. Montanez states that he was diagnosed with Type I Diabetes at seven years old and "had no major health complications relating to his diabetes" prior to his incarceration. Id. at 1, 10.

Montanez entered FDOC custody on August 1, 2018, and in September 2018, was transferred to South Bay Correctional Facility (South Bay)[2]. Id. at 10. Montanez alleges that at South Bay his diet "consisted almost entirely of carbohydrates." Id. at 10. According to Montanez, while at South Bay, he suffered from severe hypoglycemia frequently and that such incidents caused him to have seizures and lose consciousness. Id. at 11. Montanez alleges that Defendant Amede, an Advanced Practice Registered Nurse, was his primary medical provider at South Bay. Id. at 3, 12. He further alleges that although Defendant Amede was aware of his "erratic glucose levels," when Montanez

---

[1] In considering Defendants' Motions, the Court must accept all factual allegations in the Amended Complaint as true, consider the allegations in the light most favorable to Montanez, and accept all reasonable inferences that can be drawn from such allegations. See Holland v. Carnival Corp., 50 F.4th 1088, 1093 (11th Cir. 2022). As such, the facts recited here are drawn from the Amended Complaint and may well differ from those that ultimately can be proved.

[2] Pursuant to a contract with FDOC, South Bay is run by GEO Secure Services, LLC (GEO). Id. at 10.

3

expressed concern to her that his insulin regimen was inappropriate and causing him issues, she responded that he "could either accept her treatment, or be punished with solitary confinement." Id. at 12. Montanez states he "begged" Defendant Amede to refer him to an endocrinologist to help control his glucose, but she denied those requests. Id. at 12–13. Montanez states that another provider ordered an endocrinology consult which occurred in 2021, but that despite the endocrinology finding he has "poorly controlled diabetes," Defendant Amede failed to comply with the endocrinologist's recommendations. Id. at 13. Montanez asserts that from 2021, his eyesight and kidney function declined. Id. On April 22, 2022, Montanez alleges he suffered a severe hyperglycemic episode, which led to his admission to Lakeside Medical Center, where his provider again recommended changes to his insulin regime, but Defendant Amede failed to implement them. Id. at 13–14.

On May 9, 2022, the FDOC transferred Montanez to the Reception and Medical Center (RMC). Id. at 10, 14. According to Montanez, his dorm at RMC has no air-conditioning and the "heat index in that dorm regularly exceeds 100 degrees Fahrenheit," which is particularly dangerous to diabetics who are vulnerable to heat-related illnesses. Id. at 14. Montanez asserts that since his transfer to RMC, he has not been provided with a diet "suitable for a diabetic" nor provided with "access to an appropriate source of carbohydrates

4

such as fruit juice or glucose tablets" to use to avoid and treat his hypoglycemia. Id. at 14. Montanez contends that Defendant Centurion was responsible for providing medical care to people confined at RMC. Id. at 3, 14. Montanez further alleges his glucose remained "uncontrolled" throughout 2022 which led to kidney failure and worsened eyesight and neuropathy. Id. at 15.

On October 15, 2022, Montanez underwent surgery to remove his gallbladder at Jacksonville Memorial Hospital. Id. According to Montanez, an endocrinologist saw Montanez while at the hospital and suggested another change to Montanez's insulin regime, but the endocrinologist's recommendations were ignored at RMC. Id. According to Montanez, the providers at RMC checked his glucose and gave him insulin just twice a day "pursuant to Centurion's standard procedure," rather than the five times a day recommended by the hospital's endocrinologist. Id. Montanez asserts Defendant Irizarry-Ortiz was the primary doctor responsible for his care at RMC throughout 2024 and 2025. Id. at 16. Montanez also asserts that despite his counsel's communication with Centurion and Warden Lamb at various points in late 2023 and 2024, his treatment continued to be mismanaged, leading to several urgent care visits, episodes of lost consciousness, and diabetic seizures prior to the filing of this action. Id. at 15–18.

5

Based upon these allegations, Montanez asserts that Defendant FDOC violated his rights under the ADA and RA by denying him "the benefits of FDC services, programs, and activities, including but not limited to adequate food and safe housing" because of his disability. He further asserts that all Defendants acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. Id. at 23–28. As relief, he requests monetary damages, injunctive relief, and costs. Id. at 22, 23, 26, 28.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262–63 (11th Cir. 2004). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that

6

is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" <u>Twombly</u>, 550 U.S. at 555 (internal quotations omitted); <u>see also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (quotations, citation, and original alteration omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." <u>Iqbal</u>, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).

## IV. Discussion

In Defendants' Motions, Defendants each argue Montanez's Amended Complaint should be dismissed because he failed to exhaust his administrative remedies. Amede Motion at 8–9; Centurion Motion at 15–19;

7

FDOC Motion at 5–22. Defendants Centurion and Irizarry-Ortiz further assert Montanez has failed to state a claim against them and that he failed to carry his burden for injunctive relief. Centurion Motion at 7–15, 19–21. Defendants FDOC and Lamb also assert that Defendant Lamb should be terminated as a redundant Defendant in this action. FDOC Motion at 22–23.

In his PI Motion, Montanez requests preliminary injunctive relief against all Defendants other than Defendant Amede. PI Motion at 1.

> "A preliminary injunction is an extraordinary remedy never awarded as of right," id.[3] at 1077 (internal quotation marks omitted), and the party seeking that remedy must satisfy a four-part test, Otto v. City of Boca Raton, 981 F.3d 854, 860 (11th Cir. 2020). First, it must prove that "it has a substantial likelihood of success on the merits." Id. (internal quotation marks omitted). Second, it must prove that it will suffer irreparable injury unless the injunction issues. Id. Third, it must prove that the injury that threatens it "outweighs whatever damage the proposed injunction may cause the opposing party." Id. (internal quotation marks omitted). Finally, it must prove that "the injunction would not be adverse to the public interest" if issued. Id. (internal quotation marks omitted).

Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health, 50 F.4th 1126, 1134–35 (11th Cir. 2022); Keister v. Bell, 879 F.3d 1282, 1287-88 (11th Cir. 2018). The movant must clearly establish the burden of persuasion as to the four requisites. See McDonald's Corp. v. Robertson,

---

[3] Fed. Trade Comm'n v. On Point Cap. Partners LLC, 17 F.4th 1066 (11th Cir. 2021).

147 F.3d 1301, 1306 (11th Cir. 1998). Additionally, a request for injunctive relief must relate to the relief requested in the complaint. See Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005) ("any motion . . . for either a preliminary or permanent injunction must be based upon a cause of action."); see also Kaimowitz v. Orlando, 122 F.3d 41, 43 (11th Cir. 1997) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit."), opinion amended on other grounds on reh'g, 131 F.3d 950 (11th Cir. 1997).

In their PI Responses, the relevant Defendants argue that Montanez is not entitled to preliminary injunctive relief because he fails to meet his burden to show such relief is warranted because he cannot show a substantial likelihood of success based in part on the arguments presented in Defendants' Motions. See Docs. 77 at 5–15; 78 at 6–20. Because Montanez must show a substantial likelihood of success on the merits to be entitled to preliminary injunctive relief, the Court will first address the merits of Defendants' Motions.

## A. Exhaustion of Administrative Remedies

### 1. PLRA Exhaustion

The Prison Litigation Reform Act (PLRA) requires exhaustion of available administrative remedies before a 42 U.S.C. § 1983 action regarding

9

prison conditions may be initiated by a prisoner in a district court. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); see also Woodford v. Ngo, 548 U.S. 81, 92–93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). Still, prisoners are not required to "specially plead or demonstrate exhaustion in their complaints." See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits[.]" Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008); see also Jones, 549 U.S. at 211. The Supreme Court has instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" Woodford, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought[.]" Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) (citing Jones, 549 U.S. at 211). Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in the applicable administrative rules and policies of the institution. Woodford, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

Id. at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" Id.

In Ross v. Blake, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 578 U.S. 632, 648 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cnty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to

11

aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears "the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." Turner, 541 F.3d at 1082. The Eleventh Circuit has articulated a two-step process that district courts must employ when examining the issue of exhaustion of administrative remedies.

> In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082–83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015).

12

The FDOC provides inmates with a three-step grievance process for exhausting administrative remedies. As the Eleventh Circuit has described it:

> The grievance procedure applicable to Florida prisoners is set out in § 33-103 of the Florida Administrative Code. Section 33-103 contemplates a three-step sequential grievance procedure: (1) informal grievance; (2) formal grievance; and then (3) administrative appeal. Dimanche, 783 F.3d at 1211. Informal grievances are handled by the staff member responsible for the particular area of the problem at the institution; formal grievances are handled by the warden of the institution; and administrative appeals are handled by the Office of the Secretary of the FDOC. See Fla. Admin. Code. §§ 33-103.005–103.007. To exhaust these remedies, prisoners ordinarily must complete these steps in order and within the time limits set forth in § 33-103.011, and must either receive a response or wait a certain period of time before proceeding to the next step. See id. § 33-103.011(4).

Pavao, 679 F. App'x at 824.[4]

According to Rule 33-103.014, an informal grievance, formal grievance, direct grievance, or grievance appeal "may be returned to the inmate without further processing if, following a review of the grievance, one or more . . . conditions are found to exist." Fla. Admin. Code R. 33-103.014(1). The rule provides an enumerated list as "the only reasons for returning a grievance

---

[4] Though GEO runs South Bay, it has "fully adopted Florida Administrative Code § 33-103 for all purposes related to inmate grievances." Docs. 39-1 at 1; 59-1 at 1.

without a response on the merits." <u>See</u> Fla. Admin. Code R. 33-103.014(1)(a)– (y). A grievance can be returned without action if it: is untimely; "addresses more than one issue or complaint"; is "so broad, general or vague in nature that it cannot be clearly investigated, evaluated, and responded to"; is "not written legibly and cannot be clearly understood"; is a supplement to a previously-submitted grievance that has been accepted for review; does not "provide a valid reason for by-passing the previous levels of review as required or the reason provided is not acceptable"; or does not include the required attachments. <u>See</u> Fla. Admin. Code R. 33-103.014(1).

### 2. The Parties' Positions Regarding Exhaustion

Montanez asserts he exhausted his administrative remedies. Amended Complaint at 19. Defendants, however, argue Montanez failed to exhaust his administrative remedies with respect to any claim. <u>See generally</u> Defendants' Motions. Specifically, Defendants FDOC, Lamb, and Amede contend that Montanez submitted a single informal grievance[5] while at South Bay, related to the quantity of food he received, that the grievance was denied, and Montanez never appealed the denial. Amede Motion at 8; FDOC Motion at 10–11; Docs. 39-1, 74-8. They assert that this grievance is incomplete and insufficient to exhaust any claim against Defendants Amede, FDOC, or Lamb for claims related to his care at South Bay. Amede Motion at 8; FDOC Motion

---

[5] Informal Grievance 405-1810-0261. Docs. 41-1 at 9, 74-8 at 2.

at 11. They further argue that while housed at RMC, Montanez submitted one formal grievance and two appeals, which Defendants Centurion, Irizarry-Ortiz, FDOC, and Lamb contend are insufficient to accomplish exhaustion because they do not address the allegations raised in the Amended Complaint, and to the extent that they do, Montanez did not complete the three-step FDOC grievance process as required for exhaustion. Centurion Motion at 18–19; FDOC Motion at 11–13.

In Montanez's Responses, he argues that the grievance process was "unavailable" to him because the FDOC procedure is so opaque that it was unknowable to him, that the process is "a simple dead end," and that the process became further unavailable to him when he was rendered legally blind and was not provided an audible version of the grievance procedure or an assistant to help him with the procedure. Docs. 46 at 4–7; 47 at 14–16; 90 at 5–9. Montanez also asserts the grievance process was unavailable to him at South Bay because guards refused to provide him with the required 303 formal grievance form and threatened him for asking for it. Docs. 46 at 8–10; 47 at 14–16; 90 at 9–11. Montanez contends the grievance process was unavailable to him at RMC because the aid assigned to assist him robbed him and because FDOC "unjustifiably" rejected his attempts to submit to the grievance procedure, rendering the process unavailable by machination and misrepresentation. Docs. 46 at 10–15; 47 at 14–16; 90 at 11–17.

15

With Defendants' Motions, Defendants provide declarations and records regarding Montanez's exhaustion efforts. See Docs. 39-1; 41-1; 59-1; 74-1 through 74-10. Montanez also submits declarations and records in support of his arguments. See Docs. 46-1 through 46-4; 90-1 through 90-4.

### 3. <u>Turner</u> Step One

Under the first step of the <u>Turner</u> analysis, the Court must review the allegations in Defendants' Motions and Montanez's Responses and accept as true Montanez's allegations. See <u>Whatley</u>, 802 F.3d at 1209. If Montanez's allegations show a failure to exhaust, then dismissal would be appropriate. See <u>id.</u>

Accepting Montanez's allegations that he exhausted these claims through grievances and that the grievance process was unavailable to him, the Court finds dismissal of the claims against Defendants for lack of exhaustion is not warranted at the first step of <u>Turner</u>. Thus, the Court proceeds to the second step of the two-part process and considers the Defendants' arguments about exhaustion and makes findings of fact.

### 4. <u>Turner</u> Step Two

As dismissal would not be appropriate based on the allegations in the Defendants' Motions and Montanez's Responses, the Court turns to the second prong of the <u>Turner</u> analysis. The purpose of administrative exhaustion "is to put the [administrative authority] on notice of all issues in

16

contention and to allow the [authority] an opportunity to investigate those issues." Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004) (quotations and citation omitted) (alterations in original). However, to properly exhaust administrative remedies, "prisoners must complete the administrative review process in accordance with the [prison's] applicable procedural rules," Jones, 549 U.S. at 218 (quotation marks omitted). Moreover, prisoners must "properly take each step within the administrative process." Bryant, 530 F.3d at 1378. The FDOC's rules require that informal and formal grievances be legible, include accurately stated facts, and address only one issue or complaint; however, it does not include any requirements regarding the level of detail required for grievances. Fla. Admin. Code. R. 33-103.005(2)(b)2; 33-103.006(2)(d)-(f). Where a prison's grievance procedure does not require a certain level of specificity, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002), overruled in part on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 (2007); see Harvard v. Inch, 411 F. Supp. 3d 1220, 1244 (N.D. Fla. 2019).[6]

The Court will first address Montanez's exhaustion efforts and then

---

[6] The Court notes that although decisions of other district courts are not binding, they too may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

turn to his arguments that the administrative procedure was not available to him. In October 2018, Montanez submitted Informal Grievance 405-1810-0261 stating that "the kitchen [at South Bay] is constantly shorting our meals day by day." Doc. 41-1 at 9, 74-8 at 2. This informal grievance does not give adequate notice of any the claims raised in this suit. Moreover, after the grievance was denied, Montanez failed to submit a formal grievance or appeal. As such, he failed to exhaust any claim by this grievance.

Montanez did not submit another grievance until March 2023, almost a year after his transfer to RMC. Doc. 41-1 at 1, 3. In that grievance, Formal Grievance 2303-209-086,[7] Montanez sought an appointment with an ophthalmologist or vision specialist due to vision loss. Id. at 3. He made no mention of his medical care at South Bay or any diabetes care at RMC. Id. As such, this grievance would not have given Defendants notice of the claims in the Amended Complaint. Moreover, a prison official denied the grievance, see id. at 2, and Montanez did not submit an appeal, see id. at 11–12. Again, he failed to complete the administrative process for any concern addressed by this grievance.

---

[7] Montanez did not submit an informal grievance related to this formal grievance. See Doc. 41-1 at 8.

Montanez next submitted Appeal 25-6-16452 in May 2025.[8] Docs. 41-1 at 14; 74-9 at 2. In the appeal, Montanez stated:

> Today is 4/14/25.[9] On 4/24/25, I sent a grievance to the warden of RMC regarding FDC's failure to treat my diabetes. Over 20 days have passed, but I did not receive a response. Please provide me with appropriate diabetes care – my glucose has been out of control during my years of confinement with FDC.

Docs. 41-1 at 14; 74-9 at 2. Prison officials returned the appeal without action because Montanez failed to include a copy of the formal grievance submitted at the institutional level in accordance with Chapter 33-103.006. Docs. 41-1 at 13; 74-9 at 4. In the response, prison officials specifically informed Montanez that he had an additional 15 days to resubmit the appeal at his current location, attaching a copy of the formal grievance. Docs. 41-1 at 13; 74-9 at 4. However, Montanez did not do so.

Because Montanez failed to follow the procedural rules and take each step in the administrative process, he did not properly exhaust his administrative remedies through Informal Grievance 405-1810-0261, Formal Grievance 2303-209-086, or Appeal 25-6-16452. See Woodford, 548 U.S. at 90; Jones, 549 U.S. at 218; see also Hersh v. Scott, No. 3:22-CV-408-BJD-LLL, 2023 WL 2242551, at *2–3 (M.D. Fla. Feb. 27, 2023) (finding that where

---

[8] FDOC records do not reflect receipt of any informal or formal grievance by Montanez related this appeal. See 41-1 at 1, 8.

[9] In his declaration, Montanez asserts that this date is incorrect and should have been "5/14/25." Doc. 46-2 at ¶15.

grievances were returned without action, "they d[id] not satisfy the exhaustion requirement").

On September 3, 2025, Montanez submitted Appeal 25-6-28351, stating "RMC did not address my concern for my diabetes, I appeal." Doc. 41-1 at 25. He attached to this appeal a response denying Formal Grievance 2508-209-034, stating: "It is the responsibility of your health care staff to determine the appropriate treatment regimen for the condition you are experiencing, including specialty consults. If you have further questions or concerns, you may access sick call and address them with the health care staff." Id. at 26. Notably, prison officials returned this appeal without action because Montanez failed to attach the formal grievance. Docs. 41-1 at 24; 74-2 at 6. In the response, the official informed Montanez that he could resubmit the appeal within 15 days with a copy of the formal grievance. Docs. 41-1 at 24; 74-2 at 6. There is no evidence in the record suggesting he did so.

Regardless of the ultimate outcome of this appeal, the grievance could not be said to demonstrate exhaustion in this matter as exhaustion ordinarily must occur prior to the filing of an action, and this grievance process was incomplete on August 19, 2025, when Montanez filed the initial Complaint. See McDaniel v. Crosby, 194 F. App'x 610, 613 (11th Cir. 2006) ("To the extent [plaintiff] relies upon the grievances and appeals he submitted after filing his initial complaint, such grievances and appeals cannot be used to

support his claim that he exhausted his administrative remedies, because satisfaction of the exhaustion requirement was a precondition to the filing of his suit.").

The only remaining grievance is Formal Grievance 2506-209-047[10] and the corresponding appeal, Appeal 25-6-22012. Docs. 41-1 at 18, 22; 74-10 at 2, 6. Montanez submitted Formal Grievance 2506-209-047 on June 11, 2025, stating: "Since I have been incarcerated my blood sugars have been out of control. Please give me effective diabetes management." Docs. 41-1 at 22; 74-10 at 2. On or about June 16, 2025, a prison official denied the grievance, stating that Montanez was receiving insulin for diabetes and was being "treated in accordance with [F]D[O]C policy and procedure." Docs. 41-1 at 20; 74-10 at 4. Montanez submitted Appeal 25-6-22012, stating "RMC did not address my concern for my diabetes I appeal." Docs. 41-1 at 18; 74-10 at 6. Montanez dated the form "6/26/25", and it is stamped as received by the Department of Corrections Inmate Grievance Appeals on July 14, 2025. Docs. 41-1 at 18; 74-10 at 6. Prison officials returned the appeal without action, stating, "Your request for administrative appeal has been received in non-compliance with Chapter 33, "Appeals must be received in the Office of the

---

[10] There is no evidence of an informal grievance submitted prior to this formal grievance. However, under the FDOC grievance procedure, a prisoner may bypass the informal grievance step when filing a medical grievance. See Fla. Admin. Code R. 33.103.006(3)(6).

Secretary within 15 calendar days of the institutional response." Docs. 41-1 at 16; 74-10 at 8.

Pursuant to the Florida Administrative Code, while grievance appeals "must be received within 15 calendar days of the date the formal grievance is returned to the inmate," the applicable rule specifically states "in instances when an inmate places his . . . appeal into the grievance box on the 15th day" it will be deemed timely. See Fla. Admin. Code R. 33-103.011(1)(c)(1). It follows that the date of submission into the grievance box is the relevant date to determine the timeliness of an appeal. FDOC staff members are required to document the date an appeal is received or collected from the grievance box by stamping the envelope when the appeal is submitted in a sealed envelope or by stamping the "bottom-left portion of the form DC1-303" if the appeal is not submitted in a sealed envelope. See Fla. Admin. Code. R. 33-103.007(5)(c)(i), (5)(e)(1). Here, the parties do not agree on whether this appeal was submitted in a sealed envelope, but that is of no consequence to the Court's analysis. This is so because Defendants have no record of a date-stamped envelope for this appeal, nor is there a date-stamp on the bottom-left of Montanez's form. See Docs. 41-1 at 18; 74-2 at ¶15; 74-3 at 4; 74-10 at 6. Thus, Defendants have provided no evidence of the date on which Montanez "place[d] his appeal in the grievance box." The only evidence before the Court of the date of submission consists of Montanez's handwritten date on the

22

DC1-303 form (June 26, 2025), Doc. 41-1 at 18, and declarations from Montanez and another inmate, Cornie Jackson, stating that Jackson helped Montanez submit the appeal by placing it into the locked grievance box on June 26 or 27, 2025, Docs. 46-2 at ¶19; 46-4 at ¶6. Accordingly, considering the record, the Court finds Defendants have not met their burden to show this appeal was untimely or that Montanez failed to complete the required FDOC administrative process with respect to Formal Grievance 2506-209-047 and the corresponding appeal, Appeal 25-6-22012. See Dimanche, 783 F.3d at 1210–14 (finding the district court erred in dismissing claims where the FDOC improperly returned the plaintiff's grievance without action); see also Rivera v. Kyer, No. 4:20cv532-WS-MAF, 2021 WL 4755631, at *3–6 (N.D. Fla. Aug. 30, 2021) (finding defendants had not met their burden to show lack of exhaustion where defendants did not show plaintiff's allegations of timely submission of his grievance were untrue), rep. & recommendation adopted by, 2021 WL 4745646, at *1 (N.D. Fla. Oct. 12, 2021).

This, however, does not end the Court's inquiry on the sufficiency of this grievance to accomplish exhaustion as to the claims in this action. Upon consideration of the record, the Court finds that Formal Grievance 2506-209-047 and Appeal 25-6-22012 are not sufficient to exhaust all the claims Montanez raises in his Amended Complaint. This grievance and the associated appeal cannot be said to provide Defendants notice that Montanez

was attempting to grieve the treatment he received at South Bay, particularly where there is no mention of South Bay, any specific conduct occurring at South Bay, or any South Bay medical personnel, and the formal grievance was filed <u>over three years</u> after Montanez's transfer to RMC. It similarly fails to provide notice to any Defendant that Montanez believed he was being denied any accommodation in the form of food or housing under the ADA or RA. Indeed, these grievances can only be interpreted to provide notice that Montanez was grieving the medical treatment of his diabetes at RMC. Thus, Montanez has exhausted his administrative remedies as to his Eighth Amendment claims raised in Counts III and IV as they relate to his medical care at RMC. However, his ADA and RA claims in Counts I and II, as well as his claim against Defendant Amede in Count IV, are unexhausted and due to be dismissed.

As some of Montanez's claims are due to be dismissed for his failure to exhaust administrative remedies, the Court must address Montanez's contention that the grievance process was unavailable to him. "While the burden is on the defendant to show an available administrative remedy, once that burden has been met, the burden going forward shifts to the plaintiff, who, pursuant to <u>Turner</u>, must demonstrate that the grievance procedure was 'subjectively' and 'objectively' unavailable to him." <u>Geter v. Baldwin State Prison</u>, 974 F.3d 1348, 1356 (11th Cir. 2020) (quoting <u>Turner</u>, 541 F.3d

at 1085). Here, Defendants have submitted evidence establishing that FDOC had an available administrative grievance process at both South Bay and RMC. Docs. 39-1; 41-1; 59-1; 74-2; 74-4; 74-7; 74-8; 74-9; 74-10. Yet, the Court has concluded that Montanez failed to adequately resort to that process to exhaust all his claims. Turning to Montanez's arguments in support of unavailability, the Court finds Montanez has not shown that the FDOC grievance procedure was "so opaque" that it was incapable of use or that it was "a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Indeed, the evidence in the record shows that many inmates have availed themselves of the available process at each facility. <u>See</u> Docs. 59-1 at 1, 12–405; 74-2 at ¶¶2–6. While Montanez shows evidence of a small success rate for grievances raised at RMC from May 2025 to July 2025, <u>see</u> Doc. 90-4, this three-month sampling is insufficient, particularly in a case where the allegations span over the course of eight years. Moreover, with no information regarding the reasons grievances were denied or returned, the Court cannot draw any meaningful conclusion from this data point. Additionally, the evidentiary record does not support the assertion that the process was unknowable to Montanez, or other inmates, who receive training on the grievance process when they enter each facility. <u>See</u> Doc. 59-1 at 1, 5–11; 74-2 at ¶5.

### i. *Blindness*

Montanez suggests "any hope of . . . exhausting the grievance process . . . disappeared by October 2021, when [he] became functionally blind." Doc. 46 at 6. According to Montanez, he was never provided an audible version of the inmate grievance procedure or an assistant "who was willing and able to help exhaust the grievance process," effectively rendering the process unavailable. Id. at 6–7.

In considering this contention, the Court notes that in <u>Ross</u> the Supreme Court cautioned that courts "may not engraft an unwritten 'special circumstances' exception" to the exhaustion requirement. <u>Ross</u>, 578 U.S. at 648. This type of purported unavailability does not fall squarely within one of the three bases for unavailability listed in <u>Ross</u>, nor does any party to this action present any binding case law extending the <u>Ross</u> exceptions to this scenario. Certainly blindness would present a challenge to completing the grievance process, but it is incumbent upon Montanez to show that the process was subjectively and objectively unavailable to him. <u>See</u> <u>Geter</u>, 974 F.3d at 1356. While Montanez alleges that FDOC did not provide him with an audible version of the grievance procedure or an assistant who could help him, he fails to suggest that he ever requested an audible version of the grievance procedure. Moreover, the evidence shows that FDOC has provisions to assist vision-impaired individuals with perfecting the exhaustion process,

26

including allowing for additional time as well as allowing fellow inmates to assist in the drafting of those grievances. See Doc. 74-3 at 3. Also, contrary to the assertion that FDOC did not provide him with an assistant who could help him, Montanez admits that upon arrival to RMC, FDOC assigned Montanez an orderly to assist him. Doc. 46-2 at ¶ 12. While Montanez states that the orderly assigned to him robbed him and "[s]o [Montanez] stopped asking for his help," see id., Montanez does not assert that he alerted FDOC to this concern, attempted to get another orderly, or otherwise requested assistance with the grievance process. He further does not assert that he ever asked for such assistance at South Bay. Importantly, the fact that he submitted grievances with the assistance of other individuals shows that the grievance process was not unknowable or unavailable to him.

In arguing that his blindness supports a finding of unavailability, Montanez cites Brown v. Department of Public Safety and Correctional Services, 383 F. Supp. 3d 519, 543–44 (D. Md. 2019), Hollins v. Watson, No. 21-CV-00161-JPG, 2022 WL 3716165, at *8 (S.D. Ill. Aug. 29, 2022), and The National Federation v. Virginia Department of Corrections, No. 3:23-CV-127–HEH, 2024 WL 2059735, at *1 (E.D. Va. May 8, 2024). Doc. 46 at 6–7. In Brown, the court addressed an access to courts issue, not an exhaustion issue, and in analyzing the peripheral issue, hypothetically noted: "Under the PLRA, [blind] Plaintiffs may forego ordinary exhaustion requirements by

27

demonstrating that they were unable to read the print-only grievance materials or that they otherwise had no ability to use the grievance procedures." Id. Even that quotation acknowledges the burden on the plaintiff to demonstrate that he had no ability to use the grievance procedures. This, Montanez has not done. The Court in National Federation, also recognized the need for an analysis particular to the circumstances of each plaintiff. National Federation, 2024 WL 2059735, at *6. While this Court does not foreclose that a grievance process may be rendered unavailable to a blind prisoner based on individual circumstances, it does not find that Montanez has carried his burden of showing that the FDOC grievance process was unavailable to him at either South Bay or RMC. In so concluding, the Court finds the Hollins decision persuasive in the way the facts before that court differ from the facts before the Court here.

In Hollins, the district court denied summary judgment on exhaustion grounds, focusing its analysis on its determination that the applicable grievance procedure was "unknowable and incapable of use" to an "ordinary prisoner," but noting that the plaintiff "was legally blind and was refused all requests for help understanding and using it." Hollins, 2022 WL 3716165, at *8. There, Hollins asserted the jail officials "refused to explain the procedure to him, provide him with forms, or respond to his complaints. Id. at *2. Here, as stated above, the FDOC procedure was not "unknowable," and Montanez

28

does not allege that he was "refused all requests for help." Indeed, the evidence in this case shows Montanez received training on the grievance procedure, see Doc. 59-1 at 1, 5–11; 74-2 at ¶5, and Montanez has made no allegations that he ever requested any further assistance in understanding that procedure. In his declaration, Montanez also makes no allegations of requesting assistance completing the grievances, except when he asked his fellow inmates and counsel who indeed assisted him in filling out the required forms. See Doc. 46-2. Moreover, as noted above, in this case, at RMC, FDOC assigned an orderly to assist Montanez, and though it was not a fruitful relationship for Montanez, he makes no allegations that he made or was denied any requests for further or other assistance. Accordingly, the Court does not find the grievance process unavailable to Montanez on the basis of his blindness.

### ii. Unavailability at South Bay

Montanez also asserts the grievance process was unavailable at South Bay because the guards not only refused to give him the 303 form but also threatened to put him in confinement if he kept asking for the form. Doc. 46 at 8–9. According to Montanez, those threats kept him from filing grievances at South Bay because he was afraid that if he was placed in confinement, no one would see him during a period of a medical emergency that would require immediate assistance. Id. at 9–10; Doc. 46-2 at ¶¶ 6–8. Montanez's assertions

that guards refused to provide him with the 303 form after he was told by a law clerk to ask the guards for one, conflicts with his assertion that he "had never seen or heard of a 303 form at South Bay." <u>See</u> Doc. 46-2 at ¶¶ 4–6, 11. Moreover, Montanez did submit an informal grievance at South Bay, and that form as well as South Bay's response, specifically discuss the "form DC1-303, Request for Administrative Remedy or Appeal". <u>See</u> Doc. 59-1 at 3. Regardless, Defendant Amede presented a sworn declaration from Jennifer Varnum, a Grievance Coordinator at South Bay, which details that the "[g]rievance forms themselves are available to inmates at multiple locations, including the law library and any officer's station." Doc. 59-1 at 1. In her declaration, she also states that 8,954 grievances were successfully submitted at South Bay between September 1, 2018, and June 1, 2022. <u>Id.</u> This shows that, during the time Montanez was housed at South Bay, inmates were able to obtain and submit the necessary forms to initiate the grievance process, and it strains credulity to conclude that other inmates were able to obtain forms, but that Montanez could not do so and was repeatedly denied the form and threatened for requesting it.

Still, assuming threats at South Bay precluded Montanez from submitting a grievance there, Montanez could and should have submitted an out-of-time grievance when he was transferred to RMC. <u>See</u> <u>Bryant</u>, 530 F.3d at 1379 (finding two prisoners failed to exhaust their administrative

30

remedies even in the face of threats of reprisal where they were transferred to another facility and did not submit out-of-time grievance); see also Poole v. Rich, 312 F. App'x 165, 167–68 (11th Cir. 2008) ("Even if we assume that Poole was threatened and that these threats rendered grievance procedures at Rogers unavailable to Poole, Poole's complaint is still due to be dismissed because he has failed to allege that grievance procedures were unavailable to him once he was no longer incarcerated at Rogers and was removed from the threats of violence made by the officials at that prison."); Hernandez v. GEO Group, No. 23-13653, 2024 WL 3963947, at *3 (11th Cir. Aug. 28, 2024) ("Accepting as true that Graceville officers obstructed Hernandez's access to grievance forms, the record confirms that he nevertheless failed to file a grievance after that obstruction was removed when he was transferred to another facility."). Here, Montanez could have submitted an out-of-time grievance regarding his care at South Bay once he was transferred to RMC. While Montanez would have needed to show good cause for the late filing under Rule 33-103.011(2) of the Florida Administrative Code, Montanez made no attempt to do so.[11] Notably, when Montanez did submit his first

---

[11] Montanez does not argue Formal Grievance 2506-209-047 and the corresponding appeal, Appeal 25-6-22012, were an attempt to grieve any treatment at South Bay out-of-time. Even if he had, these submissions could not be understood to be an out-of-time grievance where Montanez did not request any extension of the timeframe in Rule 33-103.011(1)(b)(2) within the submissions. Nor did Montanez attempt to "clearly demonstrate . . . that it was not feasible to file the grievance

grievance at RMC, nearly a year after his transfer, he made no mention of any treatment deficiency or threats at South Bay. <u>See</u> Doc. 41-1 at 1, 3. Accordingly, Montanez failed to show that the administrative process was unavailable to him at South Bay, and as such, in conjunction with the Court's prior analysis, the Court finds that he failed to exhaust available administrative remedies as to any claim arising at South Bay.

### iii. *Unavailability at RMC*

With respect to his claims arising at RMC, Montanez asserts the grievance process was unavailable by machination and misrepresentation as demonstrated through the RMC officials' "unjustifiable" procedural rejections of his grievances. As it relates to the rejection of Appeal 25-6-16452, Montanez asserts this procedural denial was unjustifiable because he "clearly explained why [he] bypassed the institutional-level grievance: because the institution failed to respond." Doc. 46 at 11. However, this argument misunderstands the reason for rejection which was that while Montanez submitted a grievance at the institutional level, he failed to submit a copy of the grievance with his appeal. A rejection on this basis is proper under the procedural rules. <u>See</u> Fla. Admin. Code R. 33-103.014(2)-(2)(a) (If the grievance appeal is not a direct grievance . . ., the inmate shall: (a) Attach a

---

within the relevant time periods" and show that he made a good faith effort to do so within a timely manner. <u>See</u> Fla. Admin. Code R. 33-103.011(2).

copy of his formal grievance and response . . . ."); Fla. Admin. Code R. 33-103.014(1).[12] As such, it is not evidence of machination or misrepresentation.

Turning to the procedural rejection of Appeal 25-6-22012, Montanez argues the rejection of this grievance was improper based on his assertion that the appeal was provided to RMC on June 26 or 27, 2025. See Docs. 46 at 12–13; 46-2 at ¶19; 46-4 at ¶6. Montanez points to a blank page in the record, see Doc. 41-1 at 19, as evidence that the envelope, with the date-stamp, which was used for the appeal is intentionally missing. Doc. 46 at 13. In a declaration, Alan McManus, Chief of Policy Management and Inmate Appeals, explains that the blank pages in the record are simply the back of every other page of the administrative appeal. Doc. 74-3 at 5 n.1. This statement is consistent with the fact that there are blank pages every other page within this group of documents. See Doc. 41-1 at 17–23. Regardless, it appears that when the appeal was received by the Inmate Grievance Appeals division, it was 28 days after the Formal Grievance response. While the Court has determined that Defendants failed to establish that Montanez failed to exhaust his administrative remedies as to this grievance and appeal because they failed to present evidence to rebut Montanez's assertion that he

---

[12] Defendants FDOC and Lamb suggest that this appeal could have been returned as premature based on the timing. However, that is not the reason given by the responding official. See Docs. 41-1 at 13; 74-9 at 4. The Court does not address that argument because "district courts may not find a lack of exhaustion by enforcing procedural bars that the prison declined to enforce." Whatley, 802 F. 3d at 1213–14.

submitted the appeal on the June 26th or 27th, this evidence is insufficient to demonstrate intentional wrongdoing to support a conclusion that the grievance process was made unavailable by misrepresentation or machination.

Montanez next alleges that the rejection of Appeal 25-6-28351 was unjustified. Specifically, Montanez contends that the 303 form contains a misrepresentation because it only mentions a requirement to submit the response to the formal grievance rather than stating that both the formal grievance and response must be submitted. Montanez also argues the appeal was wrongly rejected based upon a declaration from the person who assisted Montanez with the submission. Docs. 46 at 13–15; 46-2 at ¶22. In the declaration, Cornie Johnson states that he included the formal grievance. Doc. 46-4 at ¶10.

As an initial matter, the Court finds that the error on the 303 form does not rise to the level of machination or misrepresentation where, as here, the Florida Administrative Code is clear. Moreover, Montanez should have known of the requirement from the rejection of his first appeal, and importantly the rejection itself provided Montanez notice that he could resubmit the appeal with the appropriate documentation within 15 days of that response. Montanez did not do so or contend at the time that he had included the formal grievance. On this record, the Court gives little weight to

34

the declaration that the formal grievance was provided with the appeal. The appeal was submitted in a sealed envelope, see Doc. 41-1 at 27, which, by procedure, was then placed in a locked grievance box, logged, and mailed to the central office without being opened. Docs. 74-2 at ¶13; 74-3 at 3. The envelope is only opened once it reaches the central office, and all documents are then scanned into FDOC's system. Docs. 74-2 at ¶13. It strains credulity to believe the central office, withdrew the formal grievance before scanning and logging the appeal and the formal grievance response, particularly where it then gave Montanez an opportunity to resubmit his grievance. Accordingly, the Court does not find the procedural rejection of this appeal to be evidence of machination and misrepresentation rendering the grievance process unavailable. Accordingly, the Court finds the grievance process was available to Montanez at RMC.

## 5. Exhaustion Conclusion

For the above reasons, the Court finds Defendants have carried their burden to demonstrate there was an available administrative process at both South Bay and RMC, but did not show that Montanez failed to exhaust his administrative remedies with respect to Formal Grievance 2506-209-047 and the corresponding appeal, Appeal 25-6-22012, which he submitted at RMC. However, the Court finds that this grievance and appeal cannot be said to have exhausted Montanez's ADA and RA claims against FDOC or any claim

35

regarding his medical care at South Bay. Thus, the Court finds that Counts I and II of the Amended Complaint (ADA and RA claims against FDOC) are due to be dismissed. Counts III and IV will proceed only with respect to the medical treatment provided to Montanez for his diabetes at RMC. Accordingly, the claims against Defendant Amede, who only treated Montanez at South Bay, and Defendant FDOC who is only named as a Defendant for Counts I and II are due to be dismissed and those Defendants will be terminated as Defendants in this case.

### B. Centurion Motion

Aside from their argument regarding exhaustion, Defendants Centurion and Irizarry-Ortiz ( "Centurion Defendants") argue Montanez has failed to state a claim against them and that he is not entitled to injunctive relief. The Court will address each argument below.

### 1.    Failure to State a Claim for Relief

In the Centurion Motion, the Centurion Defendants argue that Montanez fails to state a claim for relief against them under the Eighth Amendment. Centurion Motion at 7–15. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832

36

(1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct. Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing Farmer, 511 U.S. at 834).

As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). For decades, the Eleventh Circuit has described a "more than mere negligence" or "more than gross negligence standard" in determining whether an official acted with deliberate indifference to that serious medical need. See Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020) ("To establish deliberate indifference, a plaintiff must demonstrate that the prison officials (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence.") (internal quotations omitted)); see also Wade v. McDade, 106 F.4th 1251, 1255 (11th Cir. 2024). Recently, however, the Eleventh Circuit determined that those standards conflicted with the Supreme Court's decision in Farmer and clarified that courts in this circuit should apply the "subjective recklessness" standard as used in criminal law. See Wade, 106 F.4th at 1253. Specifically, the Eleventh Circuit

has instructed that to establish liability on an Eighth Amendment deliberate indifference claim, the plaintiff must show:

> First . . . as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'" [Farmer, 511 U.S. at 834].
>
> Second, . . . that the defendant acted with "subjective recklessness as used in the criminal law," id. at 839, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." Id. at 844–45.

Id. at 1262 (enumeration and emphasis omitted).[13]

"As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." Swain, 961 F.3d at 1285. Indeed, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330–31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials.").

---

[13] The Court notes that the Honorable Adalberto Jordan wrote a concurrence to the majority's opinion in Wade, finding that to the extent prior Eleventh Circuit deliberate indifference cases are not inconsistent with Wade, "they should continue to be cited as binding precedent." Wade, 106 F.4th at 1265 (Jordan, J., concurring).

The Eleventh Circuit has also noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007)[14] (quoting Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

i.    Centurion

Centurion argues that Montanez fails to state an Eighth Amendment deliberate indifference claim. Centurion Motion at 7–10. In support, Centurion asserts that Montanez fails to allege Centurion had a custom or policy that constituted deliberate indifference but rather attempts to hold Centurion liable for FDOC policy. Id. at 9–10. Centurion suggests this is aggravated by Montanez's inclusion of both Centurion and FDOC in Count

---

[14] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. Gov't Emps. Ins. Co., 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

III without separate allegations against each. Id. at 10. Centurion also states that Montanez only relies on his isolated treatment and interactions with a few medical providers to sustain his claim which is insufficient to show a pattern, policy, or practice. Id. at 9.

Notably, Centurion contracted with FDOC to provide medical services to inmates within the State of Florida, including those housed at RMC. Although Centurion is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present" for purposes of § 1983. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985). Indeed,

> "[w]hen a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality" under section 1983. Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997). "[L]iability under § 1983 may not be based on the doctrine of respondeat superior." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011); see Denham v. Corizon Health, Inc., Case No. 6:13-cv-1425-Orl-40KRS, 2015 WL 3509294, at *3 n.1 (M.D. Fla. June 4, 2015) ("[W]hen a government function is performed by a private entity like Corizon, the private entity is treated as the functional

40

equivalent of the government for which it works.") (citation omitted), aff'd 675 F. App'x 935 (11th Cir. 2017).

Where a deliberate indifference medical claim is brought against an entity, such as Centurion, based upon its functional equivalence to a government entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig, 643 F.3d at 1310 (quoting Grech, 335 F.3d at 1329); see Denno v. Sch. Bd. Of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the

41

constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276; see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular

42

constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law," see Sewell, 117 F.3d at 489, or a "persistent and wide-spread practice" of which the entity is aware, see Denno, 218 F.3d at 1277. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quoting Canton, 489 U.S. at 385). Because Centurion's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical care and services to inmates, Montanez must plead that an official policy or a custom or practice of Centurion was the moving force behind the alleged federal constitutional violation.

In his Amended Complaint, Montanez alleges that Centurion has provided systematically deficient diabetes care by providing insufficient

43

glucose monitoring at twice per day, providing inadequate insulin regimens of just once per day, failing to refer diabetics for consults with endocrinologists and, when they do, failing to follow the endocrinologists recommendations, providing insufficient screening for diabetic complications and only responding to those complications after they begin, and failing to take any meaningful action despite chronically abnormal glucose levels. See Amended Complaint at 25. Montanez further asserts Centurion failed to adjust these practices despite the knowledge of risks as illustrated to them by outside providers' recommendations for adjustments, the continuous progression of Montanez's complications, and contact from counsel. See id. at 15–19; 23–26. And Montanez notes that Centurion's responses to his grievances indicated that he was being treated in accordance with "policy and procedure." Id. at 15, 19.

At this stage of the proceeding, the Court is required to accept the factual allegations set forth in the Amended Complaint as true. See Iqbal, 556 U.S. at 678. Doing so, the Court finds Montanez has sufficiently stated a claim against Centurion. Montanez asserts that Centurion had a custom or practice of delaying and denying appropriate medical care to inmates with diabetes and that this custom or practice caused Montanez injury. The factual allegations regarding the deterioration of Montanez's health and

44

progression of his diabetic complications support the existence of this custom or practice and an underlying constitutional violation.

To the extent Centurion contends that Montanez's own experience is insufficient to establish the existence of a policy or custom, the Court is not persuaded. At this stage, Montanez is not required to prove that Centurion had a custom, policy, or practice of denying appropriate medical care, he need only state a plausible claim that it did so. And whether he ultimately proves this claim is best left for determination on summary judgment or at trial. Considering his allegations as a whole and accepting those allegations as true, the Court finds Montanez has sufficiently alleged a claim against Centurion. Accordingly, the Centurion Motion is due to be denied on this basis.

### ii.    Dr. Irizarry-Ortiz

Defendant Irizarry-Ortiz also asks the Court to dismiss the deliberate indifference claim against her in her individual capacity. Centurion Motion at 10–15. In support of the request, Irizarry-Ortiz suggests her actions do not rise to the level of subjective recklessness and that Montanez merely disagrees with her medical treatment. Id. at 12–15.

In his Amended Complaint, Montanez alleges that Irizarry-Ortiz was his primary medical provider throughout 2024 and 2025. Amended Complaint at 16. During that time, Montanez details many severe diabetic

complications and consequences, including further vision loss, erratic glucose levels, loss of consciousness, and diabetic seizures. Id. at 16–18. Despite these occurrences, Montanez alleges that medical personnel, under the direction of Irizarry-Ortiz, continued the same course of treatment and refused his requests for an endocrinology consult. Id.

The Court finds Montanez has stated a claim for relief against Irizarry-Ortiz. Taking the allegations as true, Irizarry-Ortiz, as his primary provider knew of his deteriorating diabetes complications and continued an ineffective treatment regime and denied him referral to an endocrinologist, leading to further decline and injury. Accordingly, the Centurion Motion is due to be denied on this basis.

## 2.    Injunctive Relief

The Centurion Defendants assert that Montanez is not entitled to the injunctive relief he seeks in the Amended Complaint, relying on authority addressing when preliminary injunctive relief is warranted and arguing that Montanez cannot show a likelihood of success on the merits. Centurion Motion at 19–21. Their argument that Montanez is unable to show a likelihood of success is largely based on the Centurion Defendants' arguments that Montanez failed to state a claim for relief. Id. at 20–21.

This Court has found that Montanez has stated a plausible claim for relief to preclude dismissal at this juncture. Certainly, Montanez will need to

46

be successful on his claims to be entitled to permanent injunctive relief. See Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). However, the Centurion Defendants point to no authority supporting the proposition that a failure to establish entitlement to preliminary injunctive relief warrants the dismissal of a plaintiff's request for permanent injunctive relief if the plaintiff is successful. Accordingly, the Court denies the Centurion Motion on this issue.

### C. FDOC Motion

In addition to their exhaustion arguments, Defendants FDOC and Lamb argue that Defendant Lamb is a redundant defendant. Because the Court found that Montanez has not exhausted his administrative remedies as to the only two claims against FDOC (Claims I and II), and the FDOC will be terminated as a Defendant in this matter, this argument is moot.

### D. PI Motion

In the PI Motion, Montanez requested that the Court order the relevant Defendants to: (1) provide Montanez with fast-acting carbohydrates for use in a hypoglycemic emergency; (2) schedule Montanez for a consult

47

with a qualified endocrinologist; and (3) follow the recommendations of that endocrinologist. See generally PI Motion. Defendants opposed the request. See Docs. 77; 78. However, the parties have worked together to render some of his requests moot. See Docs. 88; 93; 94. Nevertheless, Defendants argue Montanez is not entitled to preliminary injunctive relief because he has failed to meet his burden as to all four requirements for entitlement to preliminary injunctive relief. Docs. 77 at 5–15; 78 at 7, 10–25. And Defendants Lamb and FDOC further assert he is not entitled to this relief because he has "unclean hands." Doc. 78 at 7–10.

Montanez saw an endocrinologist, Dr. Miquel Roura, on February 4, 2026. See Doc. 77-1 at 14. Dr. Roura recommended (1) a change to Montanez's insulin regime, (2) that an accurate record of his blood glucose levels be kept ("accuchecks"), (3) that Montanez receive a continuous glucose monitor (CGM) which alerts at a certain blood glucose level, and (4) a follow up appointment in two months. Centurion has advised that it sent orders for Montanez's insulin, accuchecks, a CGM, and a follow up appointment. Doc. 77 at 4. And Montanez has now received his CGM. Doc. 93. Montanez's second and third requests for preliminary injunctive relief are, therefore, moot.

Notably, Montanez filed a Notice, stating that the only unresolved issues relating to his PI Motion are the request for fast-acting carbohydrates

and Montanez's "unexplained confinement in the infirmary," which he suggests violates his rights under the ADA. Doc. 94. The Court first considers Montanez's suggestion that his confinement in the infirmary is an issue to be addressed by this PI Motion. As an initial matter, the Court notes that it generally will not interfere with matters of prison administration, including an inmate's custody status, or his place of incarceration. See Bell v. Wolfish, 441 U.S. 520, 547-48 (1979) ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches . . . not the Judicial."). "[T]he decision where to house inmates is at the core of prison administrators' expertise." McKune v. Lile, 536 U.S. 24, 39 (2002). The Court, thus, lacks the authority to enter an order directing Defendant Lamb to place Montanez in another facility or dormitory. More importantly, though Montanez now suggests that his housing in the infirmary violates his rights under the ADA, he raised no such claim in his Amended Complaint or the PI Motion and, therefore, such a claim cannot provide a basis for a preliminary injunction in this case. See Kaimowitz, 122 F.3d at 43; see also Justus v. Horne, No. 1:22CV341/AW/ZCB, 2023 WL 5725583, at *2 (N.D. Fla. Aug. 3, 2023) (finding that new assertions in motion for preliminary injunction that arose after the filing of the complaint cannot be the basis for the preliminary injunction in the case even if they might support additional claims against

49

the same prison officials), <u>rep. and recommendation adopted</u>, No. 1:22-CV-341-AW-ZCB, 2023 WL 5713690 (N.D. Fla. Sept. 5, 2023).

As to the request for FDOC to provide fast-acting carbohydrates for Montanez's use in a hypoglycemia emergency, that request is tied to Count I and II of the Amended Complaint. <u>See</u> Amended Complaint at 21, 23. Counts I and II are subject to dismissal based upon Montanez's failure to exhaust these claims as discussed above. Thus, he fails to show a substantial likelihood of success as required to obtain preliminary injunctive relief. <u>See</u> <u>McDaniel</u>, 194 F. App'x at 613–14 ("Without refuting the district court's conclusions with regard to exhaustion, [plaintiff] could not show a substantial likelihood of success on the merits, because even assuming arguendo that his claims had merit, they could not be brought in federal court until he had sought relief through established prison procedures.").

While Montanez briefly discusses the provision of fast-acting carbohydrates in reference to the Eighth Amendment claim within his PI Motion, <u>see</u> PI Motion at 14, he does not plead this as a part of his Eighth Amendment claims in the Amended Complaint. While Defendants FDOC and Lamb discuss the argument regarding the provision of snacks as part of the Eighth Amendment claim in response to the PI Motion, they simply do so in response to the arguments as made by Montanez. <u>See</u> Doc. 78 at 10 (citing the PI Motion as the source of Montanez's argument that the lack of provision

50

of snacks violated the Eighth Amendment). The parties' other filings, including Montanez's own, demonstrate that the failure to provide fast-acting carbohydrates was not contemplated to be the basis of a claim in the Eighth Amendment context. For example, the Centurion Defendants do not discuss the provision of fast-acting carbohydrates in their argument for failure to state a claim under the Eighth Amendment. See Centurion Motion at 7–15. More importantly, in his response opposing the Centurion Defendants' request for dismissal for failure to state an Eighth Amendment claim, Montanez did not reference the failure to provide fast-acting carbohydrates as part of his claims that would survive dismissal. See Doc. 47 at 1–13.

Even if the Court were to find that the provision of fast-acting carbohydrates was part of the remaining Eighth Amendment claims, which it does not, Montanez has not shown a substantial likelihood of success on the merits of such a claim. Indeed, while Montanez's expert recommends provision of fast-acting carbohydrates, the endocrinologist Montanez just saw made no recommendation for such provisions. See Doc. 79-1. Additionally, Montanez saw endocrinologists in 2021 and 2022, neither of which recommended such provisions. Amended Complaint at 13, 15; Docs. 62-6; 62-7. Accordingly, based on this record, Montanez has shown no more than "a simple difference in medical opinion" which would be insufficient to support a

51

deliberate indifference claim. <u>See</u> <u>Bismark</u>, 213 F. App'x at 897. For these reasons, Montanez's PI Motion is due to be denied.[15]

Accordingly, it is

**ORDERED:**

1. Defendant Amede's Motion to Dismiss (Doc. 39) is **GRANTED based on Montanez's failure to exhaust administrative remedies as to the claim against this Defendant.**

2. Defendants Centurion of Florida LLC and Maricellis Irizarry-Ortiz's Motion to Dismiss (Doc. 41) is **DENIED**.

3. Defendants FDOC and Travis Lamb's Motion to Dismiss (Doc. 74) is **GRANTED in part to the extent that the claims against the FDOC (Counts I and II) are dismissed without prejudice based on Montanez's failure to exhaust administrative remedies and DENIED in part in all other respects**.

4. The Clerk shall terminate the Florida Department of Corrections and Marie-Michelle Amede as Defendants in this matter.

5. Defendants Centurion, Maricellis Irizarry-Ortiz, and Travis Lamb must answer the Amended Complaint (Doc. 34) within **twenty days** of the date of this Order.

---

[15] Because the Court finds the PI motion is due to be denied on an alternate basis, it need not address the "unclean hands" argument posed by Defendants FDOC and Lamb.

6.    Montanez's Motion for Preliminary Injunction (Doc. 62) is **DENIED**.

7.    The Court will withhold entry of judgment until the claims remaining in this action have been resolved.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of April, 2026.

MARCIA MORALES HOWARD
United States District Judge

JaxP-12
C:    Counsel of Record